No. 18,985.

THE STATE OF KANSAS, ex rel. JOHN S. DAWSON, as Attorney-general, etc., *Plaintiff,* v. EARL AKERS, as State Treasurer, etc., et al., *Defendants.*

SYLLABUS BY THE COURT.

1. NAVIGABLE WATERS—*Test of Navigability.* The main test of navigability in this country is ascertained by use or by public acts or declarations. The foundation for navigability in law is navigability in fact following the appropriation to public use and its publicity. The ebb and flow of the tide has nothing to do with making waters navigable. To say that waters are public is equivalent in a legal sense to saying they are navigable.

2. SAME—*The Kansas and the Arkansas Rivers Recognized as Navigable Streams by Acts of Congress.* By the declarations of the United States in the several acts of congress relating to the survey and disposal of the public lands, and by other legislation relating to the western country out of which Kansas territory was carved, the Mississippi river and its navigable trubutaries, which include the Kansas and the Arkansas rivers in Kansas, were constituted public highways and recognized as navigable streams in the fullest and broadest sense.

3. SAME—*The Strict Rule of the Common Law that Only Tidal Streams are Navigable is No Part of the Common Law of Kansas.* The supreme court of the United States having in 1851 repudiated the common law definition of navigable waters, and the same test of navigability having been repudiated by many of the states in the Union before the act of the territorial legislature of 1855 adopting the common law was enacted, the strict rule of the common law defining navigable waters was never a part of the common law of Kansas; Kansas entered the Union upon an equal footing with the other states, and upon her admission absolute property in and dominion and sovereignty over the soils under the navigable and public streams within its limits passed to the state, in trust for all the people, subject to the superior rights of the federal government with respect to navigation.

4. SAME—*Title to Bed of Public Stream—Not Acquired through Private Use or Occupancy.* As against the state, no title to the waters or bed of a public stream could be acquired through private use or occupancy, whether adverse or by permission, however long continued, or by prescription.

5. SAME—*Legislature has Power to Impose a Royalty upon the Taking of Sand from Bed of a Public Stream for Commercial Purposes.* In Kansas all the legislative power that the people possess is vested in the legislature, and it is within the power of the legislature to conserve the use of the products of the public streams for the benefit of all the people by imposing a royalty upon the taking therefrom of sand for commercial purposes, so long as it does nothing either to violate its duty to hold the title as trustee for the benefit of the people, or to interfere with the superior rights of congress to control navigation.

6. STATUTE — *Enactment — Committee's Substituted Bill under Original Title Thereafter Passed on Its Final Reading, Where the Original had been Passed on Its First and Second Readings is Validly Passed.* Chapter 259 of the Session Laws of 1913 originated in the house of representatives as house bill No. 219. It regularly passed the house on three separate readings and went to the senate where it was read twice, separately, and referred to the judiciary committee. The committee reported another bill as a substitute, the body of which differed essentially from the original but the title remained the same, and thereafter the bill was known as substitute for house bill No. 219, and in that form was passed by the senate and the house. As the title of the bill remained the same and the substitute is germane to the title and the result accom-

plished was the same as if the original bill had been amended in respect of the new matters contained in the substitute bill; *held,* that the two separate readings of the original in the senate and the previous readings of the original in the house should be treated as sufficient to make the final passage of the substitute bill in both houses a passage upon third reading.

7. SAME—*Chapter 259, Laws of 1913—Valid.* Other objections to the act considered and held that it is valid and constitutional.

Original proceeding in mandamus.    Opinion filed April 11, 1914.    Writ allowed.

*John S. Dawson,* attorney-general, for the plaintiff; *Fred S. Jackson,* of Topeka, of counsel.

*H. C. Sluss,* of Wichita, for defendant F. J. Schwartz.

*Johnson & Lucas, Francis C. Downey,* all of Kansas City, Mo., *Edwin S. McAnany,* and *Maurice L. Alden,* both of Kansas City, for defendants The Stewart-Peck Sand Company *et al.*

*Hiram C. Root,* of Topeka, for defendant F. D. Fowler.

The opinion of the court was delivered by

PORTER, J.: This is an original action in mandamus, the purpose of which is to test the constitutionality of chapter 259 of the Session Laws of 1913.

The statute attempts to regulate the sale and taking of sand and other natural products from navigable rivers and streams which are the property of the state, and to provide for payment to the state of royalties for sand and other products taken from the rivers for commercial purposes.

The defendants other than the state treasurer and the state auditor are persons and firms engaged in the business of taking sand from the rivers and offering the same for sale. If the statute is constitutional it is the duty of the sand companies to pay into the state treasury the royalties fixed by the executive council,

and such moneys immediately become a part of the general revenue fund, or of the state school fund, according to whether the sand was taken from islands belonging to the school fund, or from the rivers; and it would likewise become the duty of the state auditor to keep a record of such payments accordingly. The immediate question involves the duties of the state treasurer and the state auditor in the manner in which the fund derived from the sale of the sand shall be accounted for. The state, on the relation of the attorney-general, therefore brings the action to compel compliance by these officers with the duties imposed by the statute with respect to the fund. Since the act took effect payments of royalties have been made by some of the defendants under protest, and they have been joined as persons interested in the result of the litigation.

The objection that the state has other adequate remedies and that mandamus should not issue can not be sustained. The duty sought to be compelled is one of a purely public nature, and the writ of mandamus affords the appropriate remedy. (*Bobbett v. The State, ex rel. Dresher,* 10 Kan. 9, 14; *The State, ex rel., v. McLaughlin,* 15 Kan. 228.) The defendants other than the state officers are proper defendants if they have any material interest, however slight, in the result of the litigation. (*The State v. Dolley,* 82 Kan. 533, 108 Pac. 846.)

Chapter 259 of the Session Laws of 1913 is an act "relating to the removal of natural products from rivers and islands belonging to the state." The first section of the act makes it unlawful for any person to take from "the bed of any navigable river or any other river which is the property of the state of Kansas any sand, oil, gas, gravel or mineral, or any natural product whatsoever from any lands lying in the bed of any such river," except in accordance with the act.

Section 2 provides for obtaining the consent of the executive council of the state upon such terms as to compensation and upon such conditions as the council may determine to be just and proper, and that such compensation to the state shall be paid at such times and under such terms of supervision as the council may direct; and provides that no contract shall be entered into giving any person, company or corporation any exclusive privilege of making purchases under the act. It also contains a provision that nothing in the act "shall prevent the taking without payment therefor of any sand or gravel to be used exclusively for the improvement of public highways or to be used exclusively in the construction of public buildings or for other public use or to be used exclusively by the person taking same for his own domestic use." The same section provides that where any navigable stream extends into or through any drainage district, one-third of the proceeds of such natural products which the state may sell from within or beneath a portion of the channel of such streams lying within such district shall be paid to the treasurer of such drainage district, to be expended only by the district for the purposes for which it was created; the other two-thirds of such proceeds to be paid into the state treasury.

In section 3 the executive council is authorized to make and publish all needful rules, terms and conditions for taking, purchasing or selling sand or other products taken from the streams of the state.

Section 6 reads as follows:

"For the purposes of this act the bed and channel of any river in this state or bordering on this state to the middle of the main channel thereof and all islands and sand bars lying therein shall be considered to be the property of the state of Kansas unless this state or the United States has granted or conveyed an adverse legal or equitable interest therein since January 29, 1861, A. D., or unless there still exists a legal adverse interest therein founded upon a valid grant prior thereto; pro-

vided, that nothing in this act shall affect or impair the rights of any riparian landowner or lawful settler upon any island which is state school land."

These are the only portions of the act which are material for the present consideration. The streams from which sand is and has been taken by the defendants are the Arkansas and Kansas rivers, both meandered streams. The Kansas river is meandered from its mouth to a point above the city of Topeka; it lies wholly within the state and empties into the Missouri river, which is likewise a meandered stream. The defendant Stewart-Peck Sand Company is the owner of several tracts of land bordering on the Kansas river. The title to some of these riparian lands was vested in Wyandotte Indian allottees by patents from the United States under the treaty of 1855. Other tracts are portions of land originally patented to Silas Armstrong, a Wyandotte Indian, under the Sandusky treaty with the Wyandottes ratified in 1842 and the treaty of January, 1855. The Stewart-Peck Sand Company derives title to its riparian lands through mesne conveyances from Indian allottees under these treaties. The Stewart-Peck Southwestern Sand Company claims the title to riparian lands along the south bank of the Kansas river in the city of Topeka, which is part of a tract patented by the United States to Thomas G. Thornton, December 5, 1861. Defendant Wear Sand Company is the riparian owner and operates upon a tract of land on the south bank of the Kansas river in the city of Topeka, and derives its title through mesne conveyances from George Gardner, to whom patent was issued by the United States October 5, 1860. These defendants have been engaged for some years in taking sand from the Kansas river by means of dredges and pumps, and in selling the sand for commercial purposes.

The state has interposed its motion to quash the several returns of the defendant sand companies to the alternative writ, and the case is thus presented to us upon its merits.

Briefly summarized, the main contentions of these defendants are:

1. The common law of England, as it existed prior to 1607, having been in force in Kansas territory when the treaties with the Shawnee and Wyandotte Indians were approved, and when the patents were issued to the allottees thereunder, by the United States, and when the patents were issued to Thornton and Gardner, these defendants, deraigning their several titles from such allottees and patentees, are the owners of the bed of the Kansas river adjoining their riparian holdings, between their boundary lines to the thread of the stream.

2. The title of the state to the bed of a meandered stream is not an absolute fee, which the state can dispose of as it wishes; but such title is vested in it in trust for the benefit and common right of all the people, for the purposes for which such property has been used from time immemorial, viz., the common right of passage, of fishing, of the use of the waters for domestic, agricultural and commercial purposes, and therefore the state has no proprietary right in the bed of the stream or in the water which it can sell.

3. The sands in the Kansas river form no part of its bed. They are foreign to the stratification of its bed and banks and flow into it from the upper reaches of its tributaries, beyond meander lines and beyond state lines; that these sands are in constant motion, unstable and unfixed in place, and are *feræ naturæ* in character and become the property of the one first reducing them to possession; that the common right to reduce and subject them to personal dominion is a property right of value of which the defendants can not lawfully be deprived without compensation.

4. That the right to take sand from the river is a right which under the common law may be obtained by prescription, even as against the sovereign, and that the long-continued usage by the Stewart-Peck Sand

Company under claim of right to take sand and gravel from the Kansas river has ripened into a vested estate from which it can not be deprived without compensation.

5. That chapter 259 of the Session Laws of Kansas was not legally adopted by the legislature.

The first question which we will notice is the authority of the state over the beds of navigable streams and its interest as owner therein. It may be assumed that the legislature in adopting the act in question relied to a large extent upon the recent decision of this court in *Dana v. Hurst*, 86 Kan. 947, 122 Pac. 1041, where it was ruled in the syllabus as follows:

"The title to the bed of the Arkansas river within the boundaries of Kansas is in the state."

Mr. Justice West, speaking for the court, said:

"It is not pretended that the river is now navigated or navigable in fact in Kansas, and the court, as well as everybody else, knows that it is not. But does this conclude the matter?" (p. 948.)

The opinion refers to a number of facts of which the court takes judicial notice, including the size and extent of the Arkansas river; that through its long course in Kansas both of its banks were meandered by the government surveyors; the act of congress of February 20, 1811, passed for the purpose of enabling the people of the territory of Orleans to form a constitution and state government, which provided that the Mississippi river and the navigable rivers and waters leading into the state should be common highways and forever free to the inhabitants of the state as to other citizens of the United States; also to similar provisions found in the act admitting Louisiana and the act creating the Missouri territory, and to similar declarations in the ordinance for the admission of the Northwest territory. The opinion then proceeds:

"The question as to when a stream once navigable ceases to be so by nonuse or by the accumulation of

sand or soil is one on which we have been afforded no light. But considering the character, width and length of the river, the various acts and declarations by congress in reference thereto, and the policy shown thereby with reference to waters which more than one hundred years ago were navigable according to the needs and uses of that time, and which led into the Mississippi, we deem it justifiable to hold, and do hold, that while the stream is not now navigated in fact anywhere in Kansas it has, nevertheless, not ceased to be a highway set apart by national act and declaration for public use in the manner and at the time to be determined upon by the federal government. This being true, the title to the bed is in the state, and islands therein not surveyed or claimed by the government belong also to the state, and under the act of 1907 may be sold as school land." (p. 964.)

If there be any one proposition upon which the courts have agreed "with no variableness, neither shadow of turning," it is that the extent of the title of the owner of lands bordering upon navigable waters depends upon the local law. Whether under a patent from the United States the title extends to the center of the stream or lake or is limited to the margin thereof is everywhere held to be dependent on the law of the state. (*Martin et al. v. Waddell,* 16 Pet. [41 U. S.] 367; *Pollard's Lessee v. Hagan et al.,* 3 How. [44 U. S.] 212, 11 L. Ed. 565; *Weber v. Harbor Commissioners,* 18 Wall. [85 U. S.] 57, 21 L. Ed. 798; *Barney v. Keokuk,* 94 U. S. 324; *Packer v. Bird,* 137 U. S. 661; *Hardin v. Jordan,* 140 U. S. 371, 35 L. Ed., 428; *Shively v. Bowlby,* 152 U. S. 1, 38 L. Ed. 31; *Philadelphia Co. v. Stimson,* 223 U. S. 605, 56 L. Ed. 570; *Scott v. Lattig,* 227 U. S. 229, 57 L. Ed. 490.)

In *Barney v. Keokuk,* supra, it was said:

"If they (the states) choose to resign to the riparian proprietor rights which properly belong to them in their sovereign capacity, it is not for others to raise objections." (p. 338.)

12—92 KAN.

In *United States v. Chandler-Dunbar Co.*, 229 U. S. 53, 57 L. Ed. 1063, it is said in the opinion:

"The technical title to the beds of the navigable rivers of the United States is either in the states in which the rivers are situated, or in the owners of the land bordering upon such rivers. Whether in one or the other is a question of local law." (Cases cited, p. 60.)

In the recent case of *Kansas v. Colorado*, 206 U. S. 46, the United States itself was a party and resisted a claim asserted by Kansas to the ownership of the bed of the Arkansas river. In the opinion Mr. Justice Brewer said:

"But it is useless to pursue the inquiry further in this direction. It is enough for the purposes of this case that each state has full jurisdiction over the lands within its borders, including the beds of streams and other waters." (p. 93.)

A multitude of cases to the same effect might be cited from the courts of the various states. In fact, whether a patent of upland from the United States conveyed the title to the bed of navigable streams is not a federal question within the removal acts. (Gould on Waters, 3d ed., § 40; *Kenyon v. Knipe*, 46 Fed. 309.) Although in a former edition the exact contrary was said to be the law. (Gould on Waters, 2d ed., § 40.)

Our first inquiry, therefore, must be, what is the law of Kansas? In his dissenting opinion in *Hardin v. Jordan*, supra, Mr. Justice Brewer, after stating that "beyond all dispute the settled law of this court, established by repeated decisions, is that the question how far the title of a riparian owner extends is one of local law" (p. 402), used this language:

"For a determination of that question the statutes of the state and the decisions of its highest court furnished the best and the final authority." (p. 402.)

We have no hesitation in declaring that the law of Kansas upon this question has been settled not only by statutory authority, but by previous decisions of this

court, notably: *Wood v. Fowler,* 26 Kan. 682, 40 Am. Rep. 330, and *Dana v. Hurst,* 86 Kan. 947, 122 Pac. 1041. In *Wood v. Fowler,* supra, the action was to restrain defendants from cutting and removing ice formed on the surface of the Kansas river within certain described boundaries. It involved the title of the riparian owner, who claimed to own to the center of the stream. It was decided in that case that a riparian owner owns only to the bank and not to the center of the navigable stream. In the opinion Mr. Justice Brewer, after reciting historical facts showing that the Kansas river is a navigable stream, used this language:

"The stream having been meandered, the lines of the surveys are bounded by the bank; the patents from the United States passed title only to the bank; Splitlog, as riparian owner, owned only to the bank. The title to the bed of the stream is in the state." (p. 688.)

We shall have occasion to refer again to this decision upon another branch of the present case.

In *Kregar v. Fogarty,* 78 Kan. 541, 96 Pac. 845, it was said:

"In disposing of public land bordering upon rivers it is not the policy of the government to reserve title to the lands under water, whether the stream be navigable or not. The government parts with its whole title, leaving the question of boundary, whether the shore-line or the thread of the stream, to be determined by the local law. In case of navigable waters in this state the boundary is at the bank, and the title to the bed of the stream is in the state." (Citing *Wood v. Fowler,* supra, and *Hardin v. Jordan,* 140 U. S. 371.) (p. 545.)

In the briefs counsel for defendants say:

"It is true that the government has not, directly, at any time, made a practice of disposing of the beds of nontidal rivers, where the banks thereof have been meandered in the course of the making of the public surveys; but this fact does not by any means imply *lack of power* to do so."

It must be conceded that the precise question is one upon which the courts were for a long time undecided. Expressions were found in opinions rendered by the United States supreme court which left the matter in doubt. However, as early as 1856, in the case of *Haight v. The City of Keokuk*, 4 Iowa, 199, the supreme court of Iowa announced the doctrine that the government can not convey the land between high- and low-water mark on the public navigable rivers, citing *Pollard's Lessee v. Hagan et al.*, 3 How. (44 U. S.) 212, and other authorities. In the opinion it was said:

"Although no state may exist at the time of such a grant, as in this case, yet grants and sales made under such circumstances are to be construed as having a view to the future sovereignty which may or will arise, and so as not to impair its rights when arisen." (p. 213.)

One of the first decisions by a state court holding squarely that the United States have no authority to convey the title to the bed of navigable streams within a territory before its admission to the Union was by the supreme court of Oregon in *Hinman v. Warren*, (1877) 6 Ore. 408. Oregon was admitted into the Union February 14, 1859. Long prior thereto, in 1850, congress passed an act known as the "Oregon Donation Act," requiring the lands to be surveyed as in the Northwest Territory; and it made grants or donations of land, according to government surveys, to actual settlers and occupants. The supreme court of the state, in the Hinman case, held that a patent from the United States conveyed no land below high-water mark, and that the tide-lands belong to the state of Oregon by virtue of its sovereignty. In the syllabus it was ruled that:

"The United States government has no authority to so dispose of lands within a territory as to make it impossible to admit such territory into the Union upon an equal footing with the other states. In all matters that touch the sovereignty of the future state, the general

government is simply a protector thereof, until such time as the territory becomes a state."

In the first and second editions of Gould on Waters, published in 1883 and 1891, respectively, the author used this language:

"In *Hinman v. Warren*, in Oregon, it was held that the United States, while holding the title to the soil of tide waters, can not make a valid conveyance of such soil. There are also *dicta* to this effect in the case of *Haight v. Keokuk*, in Iowa, but *Hinman v. Warren* was the first adjudication upon the subject. According to this view, the United States holds purely as trustee for the future State, and is without statutory or constitutional authority to do any act making it impossible to admit the new State upon a footing equal, in all respects, with that of the other States. The decisions of the Supreme Court of the United States were thought to lead to the conclusion reached in *Hinman v. Warren;* but it would seem that there is no very direct expression of such a view, in the opinions of that court." (§ 40.)

It is significant that in the third edition of Gould on Waters, published in 1900, the author omitted the foregoing language from the text; and section 40 was rewritten to conform to the then recent decision of the supreme court of the United States in *Shively v. Bowlby,* 152 U. S. 1. That case, decided in 1894, cites with approval *Hinman v. Warren* as stating the Oregon law. Since the case of *Shively v. Bowlby,* supra, the question can no longer be considered doubtful. In that opinion Mr. Justice Gray reviewed the decisions in this country, and referred to the origin of the law of England from the time of Lord Hale, where it was settled that the title to tide-lands or of arms of the sea below ordinary high-water mark is in the King, except where rights have been acquired by express grant or by prescription or usage. The doctrine was declared to be well settled here as in England that a grant from the sovereign of land bounded by navigable tide-water passes no title below high-water mark, unless either the

language of the grant, or long usage under it, clearly indicates that such was the intention (citing Lord Hale in Hargrave's Law Tracts 17, 18, 27; *United States v. Pacheco,* 2 Wall. [69 U. S.] 587.) *Martin et al. v. Waddell,* (1842) 16 Pet. (41 U: S.) 367, is cited as the leading case in this country, and after stating the different rules which obtain in the original states with respect to .the title to lands covered by navigable streams or by tide-waters, the opinion proceeds:

"The foregoing summary of the laws of the original States shows that there is no universal and uniform law upon the subject; but that each State has dealt with the lands under the tide waters within its borders according to its own views of justice and policy, reserving its own control over such lands, or .granting rights therein to individuals or corporations, whether owners of the adjoining upland or not, as it considered for the best interests of the public. Great caution, therefore, is necessary in applying precedents in one State to cases arising in another.

"IV. The new States admitted into the Union since the adoption of the constitution have the same rights as the original states in the tide waters, and in the lands below the high water mark, within their respective jurisdictions." (p. 26.)

. . . . . . . . .

"VIII. Notwithstanding the dicta contained in some of the opinions of this court, already quoted, to the effect that Congress has no power to grant any land below high water mark of navigable waters in a territory of the United States, it is evident that this is not strictly true." (p. 47.)

"We can not doubt, therefore, that Congress has the power to make grants of lands below high water mark of navigable waters in any territory of the United States, *whenever it becomes necessary to do so in order to perform international obligations, or to effect the improvement of such lands for the promotion and convenience of commerce with foreign nations and among the several states, or to carry out other public purposes appropriate to the objects for which the United States hold the territory.*

"IX. But Congress has never undertaken by general laws to dispose of such lands. And the reasons are not far to seek." (p. 48.) (The italics ours.)

The reasons are stated in another part of the opinion in the following language:

"The Congress of the United States, in disposing of the public lands, has constantly acted upon the theory that those lands, whether in the interior or on the coast, above high water mark, may be taken up by actual occupants, in order to encourage the settlement of the country; but that the navigable waters and the soils under them, whether within or above the ebb and flow of the tide, shall be and remain public highways; and, being chiefly valuable for the public purposes of commerce, navigation and fishery, and for the improvements necessary to secure and promote those purposes, shall not be granted away during the period of territorial government; but, unless in case of some international duty or public exigency, shall be held by the United States in trust for the future states, and shall vest in the several states, when organized and admitted into the Union, with all the powers and prerogatives appertaining to the older states in regard to such waters and soils within their respective jurisdictions; in short, shall not be disposed of piecemeal to individuals as private property, but shall be held as a whole for the purpose of being ultimately administered and dealt with for the public benefit by the state, after it shall have become a completely organized community." (p. 49.)

The court decides that a donation claim under the act did not of its own force have the effect of passing any title in lands below high-water mark.

It will be observed that the court limits the power of congress to make grants of lands below high-water mark of navigable rivers in a territory to instances where it becomes necessary to do so in order to perform international obligations, or to effect the improvement of such lands for the purposes of commerce, or to carry out other public purposes appropriate to the objects for which the United States hold the territory. The contention of defendants that congress has the power to

grant to settlers the title to the bed of nontidal navigable streams within a territory is not sustained by any express declaration of the United States supreme court to which our attention has been called; and certainly no such inference can be drawn from anything that is said in the exhaustive opinion in *Shively v. Bowlby,* supra.

Moreover, many of the decisions to which we have already referred, and numerous others which might be cited, hold that in the case of all meandered streams no part of the soil under them is included within the original survey or passes by virtue of the patent. (*Dana v. Hurst,* 86 Kan. 947, 122 Pac. 1041; *Kregar v. Fogarty,* 78 Kan. 541, 96 Pac. 845.) In *Mayor, &c., of Mobile v. Eslava,* 9 Porter (Ala.), 577, it was said:

"By the acts of Congress regulating the survey and disposal of the public lands, the federal government has renounced the title to the navigable waters, and the soil covered by them." (p. 604.)

In *Hardin v. Jordan,* supra, the court said:

"We do not think it necessary to discuss this point further. In our judgment the grants of the government for lands bounded on streams and other waters, without any reservation or restriction of terms, are to be construed as to their effect according to the law of the State in which the lands lie. The next question for consideration, therefore, is, what is the law of Illinois with regard to such grants?" (p. 384.)

The same court, in the case of *Hardin v. Shedd,* 190 U. S. 508, used this language:

"When land is conveyed by the United States bounded on a nonnavigable lake belonging to it, the grounds for the decision must be quite different from the considerations affecting a conveyance of land bounded on navigable water. In the latter case the land under the water does not belong to the United States, but has passed to the state by its admission to the Union." (p. 519.)

"The rule that a grant is to be construed most strongly against the grantor does not apply to public grants.

The government being but a trustee for the public, its grants are to be construed strictly. Grants of land by the United States, by patent, have relation to the survey, plats, and field notes." (*McManus v. Carmichael,* 3 Iowa, 1, syl.)

"The United States, upon acquiring a Territory, whether by cession from one of the States, or by treaty with a foreign country, or by discovery and settlement, take the title and the dominion of lands below high water mark of tide waters for the benefit of the whole people, and in trust for the future States to be created out of the Territory." (*Shively v. Bowlby,* 152 U. S. 1, syl. ¶ 6.)

By the policy of the state of Wisconsin, declared in numerous judicial decisions, there is a qualified title to submerged lands of rivers navigable in fact conceded to shore owners, but this qualified title is not permitted to displace or materially affect public rights or the title to lands under the streams, which are held to be in the state. In *Illinois Steel Co. v. Bilot and Wife,* 109 Wis. 418, 85 N. W. 402, 83 Am. St. Rep. 905, decided in 1901, it was held that the title to lands under lakes, ponds and navigable rivers of the state was never in the United States, except in trust for public purposes; that a patent from the United States, covering such lands, whether made before the state was admitted into the Union or thereafter, conveys no title.

In the opinion it was said:

"The United States never had title, in the Northwest Territory out of which this state was carved, to the beds of lakes, ponds, and navigable rivers, except in trust for public purposes; and its trust in that regard was transferred to the state, and must there continue forever, so far as necessary to the enjoyment thereof by the people of this commonwealth. Whatever concession the state may make without violating the essentials of the trust, it has been held, can properly be made to riparian proprietors." (p. 426.)

Among the cases cited are: *Village of Pewaukee v. Savoy and another,* 103 Wis. 271, 74 Am. St. Rep. 859,

79 N. W. 436; *Barney v. Keokuk,* 94 U. S. 324; *Railroad Company v. Schurmeir,* 7 Wall. (74 U. S.) 272.

Some of the same questions were passed upon in the recent case of *United States v. Mackey,* in the district court of the United States for the eastern district of Oklahoma, — Fed. ——. The question involved was the validity of oil and gas leases in the bed of the Arkansas river. There were three rival claimants. The United States sought to maintain the right of the Creek Indians to the oil underlying the bed of the river. The Creek Indians are one of the five civilized tribes holding permanent titles to their lands by treaty, and after the tribal relations were dissolved the lands were allotted in severalty to the members of the tribe. Avery and the Gipsy Oil Company claimed under leases from the owner of the riparian lands, Avery's title being founded upon a lease to the lands in the bed of the stream, and that of the oil company on the claim that its lease covered all the riparian lands, and therefore the bed of the stream, on the theory that the title of the riparian owners extended to the middle thread of the stream. The Pollard Hagan Oil Company claimed under a lease from the state of Oklahoma on the theory that the state acceded to the ownership of the bed of the river upon her admission to the Union, subsequent to the making of the lease. The court upheld the Oklahoma title on the ground that the Arkansas is navigable, and that the title of the United States to the river beds was in trust for the state of Oklahoma; that the Indians were mere occupants of the lands, and that the state alone could dispose of the title to the bed of the streams. In the opinion the court approves and follows the Kansas case of *Dana v. Hurst,* supra, and starts with the proposition that the Arkansas river is a navigable stream; that the grant to the Creek Nation by the patent of August 11, 1852, did not convey to that nation the same title and interest in the bed of the river as it acquired by the patent to the uplands. The

opinion contains an exhaustive review of the decisions, many of which we have already cited.

Since the argument we have been furnished with a copy of a decision by the supreme court of Oklahoma which was handed down March 10, 1914. The case is *The State of Oklahoma v. Larry Nolegs, the Jim Crow Oil Co., et al.* Portions of the syllabus read as follows:

"1. The ownership of the navigable waters and the soil under them in all the territory embraced in the Louisiana Purchase was held in trust by the Federal Government and as each of the states were created, the same, within the boundaries of such state, passed to it and the absolute right to such navigable waters and the soil thereunder is in the state, subject to the public rights and the paramount power of Congress over navigation.

"2. If a river is in fact navigable and in fact used for purposes of commerce, the title to the waters thereof and the bed thereunder is held by the Federal Government and when a Territory containing such navigable river becomes a state, the title thereto vests in the state, regardless of subsequent navigation or navigability and the fact that a riparian owner obtains title to the land adjoining such stream prior to statehood does not divest the state of such title.

"6. Where a government patent to land describes the same by lots and refers to the official plat of the survey thereof and such plat shows that the land conveyed is bounded by a navigable river, the title extends no further than the edge of the stream and does not include an island, though the channel between that and the main land may not be navigable."

The foregoing principles of law are supported in a well-considered opinion by the Oklahoma court which follows and approves the Kansas case of *Dana v. Hurst*, supra, and *United States v. Mackey*, supra, and refers to numerous acts of congress, public records and documents of the several departments at Washington recognizing the navigability of the Arkansas river. As will be observed, many of the questions passed upon are directly in point here.

But defendants assert a prior claim to the bed of the Kansas river adjoining their riparian lands by virtue of a patent issued to Silas Armstrong, a Wyandotte Indian. Again they are met and foreclosed by the decision in *Wood v. Fowler*, supra. In that case plaintiff claimed under a patent to Matthias Splitlog, a Wyandotte Indian, whose title was in all respects the same as that of Silas Armstrong to the lands in this case. But the court said:

"The stream having been meandered, the lines of the surveys are bounded by the bank; the patents from the United States passed title only to the bank; Splitlog, as riparian owner, owned only to the bank. The title to the bed of the stream is in the state." (p. 688.)

In the briefs defendants say that this language was not necessary to the decision; but the court at the time deemed the question necessary and controlling and saw fit to rest its decision on that ground, so that the language can not be regarded as dictum. The contention of defendants that the common law in all its strictness was in force in the territory of Kansas when the Indian patentees acquired title, and that by force of that law the original riparian owners took to the center thread of the stream, is also disposed of by what was said in *Wood v. Fowler*, as follows:

"It is true a distinction was recognized in England, and that streams were considered navigable only in so far as they partook of the sea, and to the extent that their waters were affected by the ebb and flow of the tide, and only so far was the title of the riparian owner limited to the bank; above such point, even although the stream was large enough to be used, and in fact was used, for purposes of navigation, the riparian owner owned the soil *ad medium filum aquæ.* . . . The same doctrine of riparian ownership to the center of the stream in all rivers unaffected by the ebb and flow of the tide, is recognized in some states of the Union; but the better and more generally accepted rule in this country is, to apply the term 'navigable' to all the streams which are in fact navigable; and in such

case to limit the title of the riparian owner to the bank of the stream. Especially is this true in the states where the lands have been surveyed and patented under the federal law. See the following authorities: *Rld. Co. v. Schurmeir,* 7 Wall. 272; *McManus v. Carmichael,* 3 Iowa, 1; *Haight v. Keokuk,* 4 Iowa, 199; *Tombden v. Rld. Co.,* 32 Iowa, 106; *Flannigan v. City of Philadelphia,* 42 Pa. St. 219; *Bridge Co. v. Kirke,* 46 Pa. St. 112; *People v. Tibbets,* 19 N. Y. 523; *People v. Loomis,* 33 N. Y. 461." (p. 689.)

The defendants, however, say that the extent to which the common law became a rule of property in Kansas is to be determined, not from language used by way of argument in *Wood v. Fowler,* but by reference to the act of the territorial legislature of 1855 (Statutes of Kansas Territory, 1855, ch. 96), which declared that the common law of England and all statutes prior to 4 James I. not local to that kingdom, and of a general nature, should be the rule of action and decision in the territory (*Sattig v. Small,* 1 Kan. 170, 175). Substantially the same provision was reënacted in 1859. In 1868 the language was changed to read:

"The common law, as modified by constitutional and statutory law, judicial decisions, and the condition and wants of the people, shall remain in force in aid of the general statutes of this state." (Gen. Stat. 1868, ch. 119, § 3.)

It is worth while to inquire by what process of reasoning it can be asserted that Kansas was deprived of her right to enter the Union upon an equality with the other states? Time and again the supreme court of the United States has declared that each of the new states is entitled to be admitted into the Union on an equal footing with the original states.

"By the preceding course of reasoning we have arrived at these general conclusions: First. The shores of navigable waters, and the soils under them, were not granted by the Constitution to the United States, but were reserved to the States, respectively. Secondly. The new States have the same rights, sovereignty,

and jurisdiction over this subject as the original States. . . . To maintain any other doctrine, is to deny that Alabama has been admitted into the Union on an equal footing with the original States, the constitution, laws, and compact, to the contrary notwithstanding." (*Pollard's Lessee v. Hagan et al.*, 3 How. [44 U. S.] 212, 230, 229, 11 L. Ed. 565, 573; *Martin et al. v. Waddell*, 16 Pet. [41 U. S.] 367; *Weber v. Harbor Commissioners*, 18 Wall. [85 U. S.] 57, 71, 21 L. Ed. 798; *Knight v. U. S. Land Association*, 142 U. S. 161, 35 L. Ed. 974; *Shively v. Bowlby*, supra; *Withers v. Buckley et al.*, 20 How. [61 U. S.] 84.)

The Kansas and the Arkansas rivers when the territorial act of 1855 was passed were navigable in fact, and were so recognized by congress in its surveys of the public lands. Ordinarily the first lands to be taken up by settlers are those on the banks of the streams. The great struggle for the admission of Kansas might have been prolonged until all but a few tracts of riparian lands along the Kansas river from its mouth to Junction City had been settled upon. Had such been the situation, and if defendants' contention is sound, Kansas would have entered the Union. stripped of the valuable right of ownership in and control over the bed of the Kansas river, or what is just as inconceivable, would have held the title only to those fragmentary portions of the bed of the stream that adjoined the lands not settled upon. Moreover, this situation would have resulted, not because. the Kansas river was not a navigable and public stream in fact, but because the common law of England as declared by Lord Hale and collected by him from decisions in the Year Books made the ebb and flow of the tide the test of navigability.

The defendants rely with much confidence upon the following language from the decision of Judge Campbell of the federal court of Oklahoma in *United States v. Mackey*, supra:

"If, therefore, we are to apply the strict rule of the common law as it existed in England at the time this

country was colonized, the rights of the owners of the upland bordering upon this stream, so far as ownership of the soil is concerned, must be considered as extending to the middle thread of the stream, to the exclusion of the state, subject only to the public right of navigation."

No one will dispute the legal proposition stated. It merely asserts that under the strict rules of the common law as it existed in England, no river or arm of the sea was in law navigable above the point where it was affected by the tide, although it may have been navigable in fact above such point, and the title of the riparian owner above the ebb and flow of the tide extended to the middle thread of the stream, while the title to the bed of that portion of the stream affected by the tide was in the crown. Of course, if that rule of the common law were applied to Kansas streams the defendants would be correct in their contention. Oklahoma's adopting statute is worded as our amended statute of 1868, and Judge Campbell may have been of the opinion that if the Oklahoma statute contained language as broad as our statute of 1855, the riparian proprietor of lands bordering on the Arkansas river would have acquired title to the middle thread of the stream. But we do not so construe the effect of the territorial acts by which Kansas adopted the rules of the common law.

We have always supposed that the first settlers in Kansas, those who came even before the Kansas-Nebraska act, brought with them the common law of England, that is so much of it as was not local to England and was applicable to the circumstances and conditions of the territory, and that the common law to that extent was already a part of the law of the territory when the adoption act of 1855 was passed.

How the common law came to Kansas is told in a comprehensive sketch of the subject in *Clark v. Allaman*, 71 Kan. 206, 80 Pac. 571. In the opinion Mr.

Justice Burch reviews the history of the formation of the Louisiana territory, and refers to the acts of congress, the legislation of the several states and territories to which Kansas has at different times in her history belonged, and cites the public documents and decided cases bearing upon the question. Speaking of the principles of the common law to which the immigrants who came from the Southern states "were inured," the opinion says:

"It was likewise notoriously the heritage of the men who came from the North to Kansas to aid in establishing its law." (p. 224.)

The opinion also quotes from the message of Governor Reeder of July 3, 1855, to the first territorial legislature as follows:

" 'It appears that the laws of the United States not inapplicable to our locality—the laws of the territory of Indiana made between the 26th of March, 1804, and the 3d of March, 1805, enacted for the district of Louisiana—the laws of the territory of Louisiana—the laws of the territory of Missouri—the common law, and the law of the province of Louisiana at the time of the cession, except so far as the latter have superseded the former, still remain in force in the territory of Kansas. As the common law to a considerable extent was adopted for the territory by congress as late as 1812, and by the Missouri legislature as late as 1816, . . . it has without doubt superseded and supplied a great amount of the law previously existing.' " (pp. 220, 221.)

Statutes solemnly enacted are often said to be merely declaratory of the common law; that is to say, the law declared by the statute was already in existence; and the courts, without the sanction of the statute, would in a proper case have enforced it. Moreover, the act of 1855 expressly excepts from its operation those rules of the common law of England which were local to that kingdom and not of a general nature. What rule could be more local to Great Britain and less general in nature than one which could only apply to the peculiar natural conditions existing there, the absence of navigable

streams that were unaffected by the ebb and flow of the tide? What rule could be imagined more unsuited to the great Mississippi and its navigable tributaries, not only rendered navigable by the laws of nature but the free navigation thereof consecrated and guaranteed by public treaties and acts of congress?

Speaking of the rights of Alabama, the supreme court said in the opinion in the case of *Pollard's Lessee v. Hagan et al.,* supra:

"But her rights of sovereignty and jurisdiction are not governed by the common law of England as it prevailed in the colonies before the Revolution, but as modified by our own institutions." (p. 229.)

In *Chisholm v. Georgia,* 2 Dallas (2 U. S.), 419, 1 L. Ed. 440, 447, Justice Iredell used this language with respect to the common law, which is so often quoted:

"I know of none such, which can affect this case, but those derived from what is properly termed 'the common law,' a law which I presume is the ground-work of the laws in every State in the Union, and which I consider, *so far as it is applicable to the peculiar circumstances of the country,* and where no special act of Legislation controls it, to be in force in each State, as it existed in England (unaltered by any statute) at the time of the first settlement of the country." (p. 435.)

The italics are ours and emphasize the qualifying language to which we wish especially to direct attention.

There has always been, it is true, a contrariety of opinion in the courts of the different states upon this question. Those of the original states with rivers and waters affected by the ebb and flow of the tide adopted the common law test of navigability. But this was repudiated by some of the original states as wholly inapplicable to great rivers and streams actually navigable and wholly unaffected by the tide. The supreme court of Pennsylvania as early as 1810 decided that the doctrine of Lord Hale as to navigable rivers is not

applicable to the larger rivers of Pennsylvania, such as the Ohio, Delaware, Susquehanna and Allegheny. Chief Justice Tilghman, who tried the case on the circuit, said in his opinion:

"But the common law principle concerning rivers, even if extended to America, would not apply to such a river as the Susquehanna, which is a mile wide, and runs several hundred miles through a rich country, and which is navigable and is actually navigated by large boats. If such a river had existed in England, no such law would ever have been applied to it. Their streams, in which the tide does not ebb and flow, are small." (*Carson v. Blazer*, 2 Binn. 475, 477.)

His ruling was affirmed in the supreme court in an opinion which, after referring to the act of the assembly of 1877, declaring that the common law of England shall be binding on the inhabitants of the state, used this language:

"But the uniform idea has ever been that only such parts of the common law as were applicable to our local situation have been received in this government. The principle is self-evident. The adoption of a different rule would, in the language of Sir Dudley Ryder, resemble the unskillful physician, who prescribes the same remedy to every species of disease. The qualities of fresh or salt water can not amongst us determine whether a river shall be deemed navigable or not. Neither can the flux or reflux of the tides ascertain its character." (p. 484.)

(To the same effect is *Shrunk v. The President, &c., of the Schuylkill Navigation Company*, 14 Serg. & Rawl. 71.)

One of the first to adopt the common sense rule was the supreme court of North Carolina in the case of *Wilson v. Forbes*, 2 Dev. (13 N. Car.) 30, decided in 1828. In the opinion, Henderson, Judge, said:

"It is clear that by the rule adopted in England, navigable waters are distinguished from others, by the ebbing and flowing of the tides—but this rule is entirely inapplicable to our situation, arising both from the great length of our rivers, extending far into the

interior, and the sand-bars and other obstructions at their mouths. By that rule, Albemarle and Pamptico sounds, which are inland seas, would not be deemed navigable waters, and would be the subject of private property." (p. 34.)

The great case of *McManus v. Carmichael*, 3 Iowa, 1, is cited with approval in our own case of *Wood v. Fowler*, supra. It is a storehouse of reason and authority to which we are much indebted. Judge Dillon was one of the counsel who contended that the absurd rules of the common law could not be made the test of the navigability of a great river like the Mississippi. In the briefs he said:

"If, . . . this river is navigable, then it is so in spite of the common law; or, more correctly speaking, it is navigable, because the common law, not having any applicability to this river, has nothing to do—I repeat it, the common law has nothing to do—with the question as to whether it is navigable or not navigable." (p. 25.)

And he was speaking of navigability in law as affecting riparian rights. In the opinion Mr. Justice Woodward used this language:

"And if we, like the people of these states, generally, have brought the common law with us; then, too, we, like them, have brought such parts of it as are adapted to our institutions and circumstances; and we ask with confidence, whether the rules and tests which are applicable enough to the rivulets of England, shall be taken to measure those waters, whose flow is through the climates and zones of the earth?" (p. 31.)

Reviewing the decided cases he said:

"In the most of those from the northeastern states, the subject is discussed very little; but they simply assume the common law rule as the one to decide by, and look no farther." (p. 33.)

He quotes from the opinion of the judges in the case of *The Canal Commissioners v. The People*, 5 Wend. 423, where Chancellor Walworth said:

"The principle itself does not appear to be sufficiently broad to embrace our large fresh water lakes, or inland

seas, which are wholly unprovided for by the common law of England. . . . . It is not necessary to express an opinion whether this principle can be properly applied to some parts of those streams which are navigable from the sea by large ships and vessels, far above the influence of the tides, as that question can never arise in this state. We have no such rivers." (pp. 447, 448.)

Commenting upon this language, Justice Woodward said:

"Surely, such an expression leaves us, who have such rivers, free to discuss the question anew, and without feeling constrained by those decisions." (p. 41.)

We quote the following extracts from the syllabus of the Iowa case:

"Although the ebb and flow of the tide was, at common law, the most usual test of navigability, it was not necessarily, the only one.

"But however this may be, that test is not applicable to the Mississippi river.

"The term *navigable* embraces within itself, not merely the idea that the waters could be navigated, but also the idea of publicity, so that saying waters are public is equivalent, in legal sense, to saying that they are navigable.

"It is navigability in fact which forms the foundation for navigability in law, and from the fact follows the appropriation to public use, and hence its publicity and legal navigability.

"The real test of navigability in this country is ascertained by use, or by public act or declaration.

"The acts and declarations of the United States declare and constitute the Mississippi river a public highway, in the highest and broadest intendment possible."

The leading western cases to the contrary are *Morgan and Harrison v. Reading*, 3 Sm. & M. (Miss.) 366, decided in 1844, and *Middleton v. Pritchard et al.*, 3 Scam. (4 Ill.) 510. So far as we have examined they are the only cases which have applied the strict rule of the common law to the Mississippi river, and which hold that it is not in law a navigable stream. The

conflict of opinion in the various states upon this vexed question has created some anomalous conditions. Because of the adherence of the Illinois courts to the strict rules of the common law as to property rights, the owner of lands in northern Illinois bordering on the east bank of the Mississippi owns the bed of the river to the middle thread, where his title is met by that of the sovereign state of Iowa.

In *Barney v. Keokuk,* supra, Justice Bradley said:

"In Iowa, as before stated, the more correct rule seems to have been adopted after a most elaborate investigation of the subject. The exhaustive examination of this question by the Supreme Court of Iowa in 1856, in the case of *McManus v. Carmichael,* 3 Iowa, 1, really leaves nothing to be said." (p. 338.)

The fact must not be lost sight of that the supreme court of the United States repudiated the absurd definition of the common law as long ago as 1851, in the case of *The Genesee Chief,* 12 How. (53 U. S.) 443. The opinion, which was delivered by Chief Justice Taney, has long been recognized as one of the monuments of the law. The court was confronted by a condition. In its earlier cases, notably *The Thomas Jefferson,* 10 Wheat. (23 U. S.) 428, the court had decided that the admiralty jurisdiction of congress was limited to tidewaters. In 1845 congress passed an act, the validity of which was regarded as doubtful, and by which it was sought to extend the admiralty jurisdiction to the great navigable streams and inland lakes. The court freely recognized its embarrassment because of its former rulings, and in the opinion regretted that the proposition had not been presented at an earlier time in the history of the country. The court, however, expressed itself as convinced that it would not do to follow an erroneous decision into which it fell "when the great importance of the question as it now presents itself could not be foreseen." (p. 456.)

In the opinion it was said:

"It is evident that a definition that would at this day limit public rivers in this country to tide-water rivers is utterly inadmissible. We have thousands of miles of public navigable water, including lakes and rivers, in which there is no tide. . . . The lakes and the waters connecting them are undoubtedly public waters; and we think are within the grant of admiralty and maritime jurisdiction in the Constitution of the United States." (p. 457.)

The act of congress was held constitutional. We must once more refer to the language of Mr. Justice Bradley in *Barney v. Keokuk,* supra:

"And since this court, in the case of *The Genesee Chief,* 12 id. 443, has declared that the Great Lakes and other navigable waters of the country, above as well as below the flow of the tide, are, in the strictest sense, entitled to the denomination of navigable waters, and amenable to the admiralty jurisdiction, there seems to be no sound reason for adhering to the old rule as to the proprietorship of the beds and shores of such waters." (p. 338.)

We have already quoted from opinions of the supreme court of Pennsylvania. The same court in a later case has held that the Monongahela is a navigable stream, and that its soil up to low-water mark, and the river itself, are the property of the commonwealth. In *Monongahela Bridge Co. v. Kirk,* 46 Pa. St. 112, the absurdity of the common-law test of navigability is aptly stated in the following language:

"We are aware that by the common law of England such streams as the Mississippi, the Missouri, the rivers Amazon and Plate, the Rhine, the Danube, the Po, the Nile, the Euphrates, the Ganges and the Indus, were not navigable rivers, but were the subject of private property, whilst an insignificant creek in a small island was elevated to the dignity of a public river, because it was so near the ocean that the tide ebbed and flowed up the whole of its petty course. The Roman law, which has pervaded Continental Europe, and which took its rise in a country where there was a tide-

less sea, recognized all rivers as navigable which were really so, and this common-sense view was adopted by the early founders of Pennsylvania, whose province was intersected by large and valuable streams, some of which are a mile in breadth." (p. 120.)

The doctrine of the Iowa courts repudiating the tidal test of navigability and declaring that a stream is navigable in law which is navigable in fact, and which has been declared to be a public stream by the acts of congress and recognized as such by government surveys of the public lands, has been expressly approved by the supreme court of the United States in the case of *Packer v. Bird,* 137 U. S. 661, 34 L. Ed. 819, which involved the title to the bed of the Sacramento river in California.   In the opinion Mr. Justice Field, after referring to the states which have adopted the common-law rule to its fullest extent and to those which like Pennsylvania and Iowa have repudiated it, used this language:

"The legislation of Congress for the survey of the public lands recognizes the general rule as to the public interest in waters of navigable streams without reference to the existence or absence of the tide in them." (p. 672.)

In the opinion it was said:

"A different test must, therefore, be sought to determine the navigability of our rivers, *with the consequent rights both to the public and the riparian owner,* and such test is found in their navigable capacity. Those rivers are regarded as public navigable rivers in law which are navigable in fact.   .   .   .   The same reasons, therefore, exist in this country for the *exclusion of the right of private ownership over the soil under navigable waters* when they are susceptible of being used as highways of commerce in the ordinary modes of trade and travel on water, as when their navigability is determined by the tidal test.   It is, indeed, the susceptibility to use as highways of commerce which gives sanction to the public right of control over navigation upon them, *and consequently to the exclusion of private ownership, either of the waters or the soils under them.*"   (Italics ours.)    (p. 667.)

In those states where the common-law test as to navigability has been followed the courts recognize the right of the state to keep the stream open for the public use of navigation, and they argue that the public right is in no way impaired by the fact that the bed of the stream is owned absolutely by the riparian owners. Thus, in *Lorman v. Benson,* 8 ·Mich. 18, 77 Am. Dec. 435, it was said:

"The public authorities can regulate water highways as well as land highways, although the soil of neither belongs to the state."   (p. 32.)

The same argument is employed by Mr. Farnham in his vigorous opposition to any relaxation to the strict rule of the common law.    (1 Farnham, Waters and Water Rights, p. 253.)

It is worthy of note that some of the courts which have felt themselves bound by the common-law test of navigability have refused to apply this doctrine in its entirety, but on the contrary have reserved to themselves the right to modify that ancient rule wherever in their judgment it has been found inapplicable to the situation and conditions of the people.   Thus, in the recent case of *Fulton L., H. & P. Co. v. State of N. Y.,* (1911) 200 N. Y. 400, 94 N. E. 199, 37 L. R. A., n. s., 307, the New York court of appeals, while declaring that in adopting the common law of England the people of that state took over such of its rules as were applicable to and consistent with their condition and circumstances, laid down the doctrine that the title to a navigable stream above tide-water is in the riparian owners, *except where it constitutes a territorial boundary.*   Now the common law of England was a system of rules and precedents designed for the government of the people of an island.   It knew nothing of streams as boundaries between states.   The decisions in New York and Iowa are not so inconsistent after all, since it appears that the courts in each state differ merely in determining what rule is best suited to the wants and

conditions of the people. Illinois, as we have seen, has applied the doctrine even to the Mississippi river, which is a state boundary.

In addition to Pennsylvania, North Carolina and Iowa, the following states have refused to be bound by the common-law test of navigable waters: Missouri (*Benson v. Morrow et al.,* 61 Mo. 347; *Cooley v. Golden,* 117 Mo. 33, 23 S. W. 100, 21 L. R. A. 300); South Carolina (*Cates v. Wadlington,* 1 McCord, 580); Tennessee (*Elder v. Burrus,* 6 Hump. [25 Tenn.] 358); Alabama (*The Mayor, &c. of Mobile, v. Eslava,* 9 Porter, 477; affirmed in 16 Pet. [41 U. S.] 234); Michigan (*La Plaisance Bay Harbor Co. v. City of Monroe,* 1 Walker, Ch. 155).

After all, in every case the substantial question is this, Is the stream navigable or not? Under the common law of England the mode of ascertaining the fact may have been uniform, and the fact that the tide ebbed and flowed in the stream may always have been taken there as evidence of the fact. Nevertheless, it is the fact of navigability and not the mode of proof upon which the rights of riparian owners should be made to depend.

We have considered the question at length because of its importance and the different view which prevails in some of the states, and for the further reason that it involves what we regard as the most meritorious of the claims urged by the defendants. We adopt the Iowa doctrine, and hold that by the declarations of the United States in the several acts of congress relating to the survey and disposal of the public lands, and by other legislation relating to the western country out of which Kansas territory was carved (and which are referred to elsewhere in this opinion and in *Wood v. Fowler,* supra, and in *Dana v. Hurst,* supra), the Mississippi river and its navigable tributaries were constituted public highways, and recognized as navigable streams in the fullest and broadest sense. The supreme

court of the United States having repudiated the common-law definition of navigable waters in 1851, and the same test of navigability having been repudiated by many of the states in the Union before the act of the territorial legislature of 1855 adopting the common law was enacted, we hold that the ancient rule of the common law defining navigable waters was never a part of the common law of Kansas; that Kansas entered the Union upon an equal footing with the other states; that upon her admission into the Union absolute property in and dominion and sovereignty over the soils under the navigable and public streams within its limits passed to the state, in trust for all the people, subject to the superior rights of the federal government with respect to navigation.

Nor do we think that anything said in *Clark v. Allaman*, 71 Kan. 206, 80 Pac. 571, holds to the contrary. The question there involved the rights of a riparian owner to the use of water for irrigation purposes from Rose creek, a stream five miles long. It is true, as stated in the opinion, that "the common-law rules in relation to riparian rights became the law of Kansas for every stream within its borders." (p. 229.) But the common-law test of navigability never became the law of Kansas. The court in *Clark v. Allaman* was not attempting to define navigable streams, nor was it the intention to declare the law as to the ownership of the bed of meandered navigable streams to be different from what had already been held in *Wood v. Fowler*, 26 Kan. 682. The defendants possess all the rights of riparian owners under the common law as that law is applicable to Kansas. What we decide is that they never acquired any property interest in the bed of the Kansas river adjoining their lands. It is unnecessary to define their riparian rights under the common law, but one of them is the right of flowage, and as was held in *City of Emporia v. Soden*, 25 Kan. 588, 34 Am. Rep. 130, 60 Am. Dec. 453, the state could not, if it would,

deprive them of such rights without compensation. (See, also, *New Whatcom v. Fairhaven Land Co.*, 24 Wash. 493, 64 Pac. 735, 54 L. R. A. 190.)

We are unable to discover any reason why the fact that the sand is mingled with the flowing water of the stream and comes originally from the upper reaches of the Kansas river affects the matter, or how that fact could deprive the state, which is the exclusive owner of the bed, of the right to dispose of any surplus water flowing over it or any natural product found therein, so long as the state does nothing either to violate its duty to hold the title as trustee for the benefit of the people nor to interfere with the superior rights of congress to control navigation. Because the title to the soil is in the state it was said in *Wood v. Fowler*, 26 Kan. 682:

"The riparian proprietor would have no more title to the ice than he would to the fish. It simply is this, that his land joins the land of the state. The fact that it so joins, gives him no title to that land, or to anything formed or grown upon it, any more than it does to anything formed or grown or found upon the land of any individual neighbor." (p. 690.)

Moreover, that sands accumulate upon the bed of the river we know to be a fact. At times of low water the bed is made up largely of bars of sand which are started in motion when the stream rises; and although it is customary in removing the sand to operate the dredges and shovels in running water, the sand taken forms a part of the bed of the stream.

In *United States v. Chandler-Dunbar Co.*, 229 U. S. 53, it was said:

"Ownership of a private stream wholly upon the lands of an individual is conceivable; but that the running water in a great navigable stream is capable of private ownership is inconceivable." (p. 69.)

In that case also it was said that there was nothing objectionable in permitting the state to let out the use of the water to private parties and thus reimburse

itself for the expenses incurred in the erection of a public dam.

The argument that because the sand is in constant motion it falls within the principle of *feræ naturæ,* and that the defendants can not be deprived of the valuable right of an individual to reduce to his possession wild animals or things of that nature does not impress us as sound. We have examined the seaweed cases cited, and do not think they support the claim of the defendants. They merely hold that seaweed cast by the tide and waves upon the land of a riparian proprietor becomes his property just as wreckage cast upon his lands belongs to him. (*Church v. Meeker,* 34 Conn. 421.) Many of the cases are controlled by statutes conferring certain rights upon the owners of riparian lands adjoining tide-water, such as the case cited in 2 Allen (84 Mass.) 549 (*Anthony v. Gifford*). The opinion expressly declares that these marine products do not become the property of the riparian proprietor until they are cast upon or attached to the land or shore. There is nothing in chapter 259 which seeks to deprive the defendants of the right to any sand cast upon their lands.

The defendants' claim by prescription can not be sustained. There is some conflict in the authorities as to whether a right may be obtained by prescription against the public, especially in regard to rights in property dedicated to public use, such as streets and highways. Some hold that rights of this character may be acquired, and others that they can not. In Pennsylvania it is settled that public rights are not destroyed by long-continued encroachments or permissive trespasses. (*Kittaning Academy v. Brown,* 41 Pa. St. 269. See, also, *Commonwealth v. Moorehead,* 118 Pa. St. 344, 12 Atl. 424, 4 Am. St. Rep. 499.) In *Town of Clinton v. Bacon,* 56 Conn. 508, 16 Atl. 548, it was held that the uninterrupted and undisputed possession by defendant of a natural oyster bed

for thirty years had not given him a title by adverse possession, the title being in the state, against which there could be no title gained by such possession. Moreover, title by prescription arises by a presumption from long-continued use of an incorporeal hereditament of a previous grant which has been lost. (3 Cruise, 467.) Therefore nothing can be prescribed, for that can not be the subject of a grant. (*Luttrel's Case*, 4 Coke's Rep. 84*b*.) To the same effect see 22 A. & E. Encycl. of L. 1187, where it is stated that the doctrine of prescription is applicable only to rights which may be granted, and that a grant will not be presumed where it could not lawfully have been made. (*Hill v. Lord*, 48 Maine, 83, 98.) In *Sollers v. Sollers*, 77 Md. 148, 26 Atl. 188, 39 Am. St. Rep. 404, it is held that title to oyster beds belonging to the state can not be acquired by prescription

"Property so held belongs to the people in virtue of their sovereign rights, and of it they can not be deprived save by their own appointment as expressed in the constitution. Legislatures can not imperil such property. Statutes may prescribe for its regulation, but not for its loss by the public and its acquisition by individuals by prescription or otherwise." (Note, 76 Am. St. Rep. 488; and to the same effect see *Burbank et al. v. Fay et al.*, 65 N. Y. 57, and *Fulton L., H. & P. Co. v. State of N. Y.*, 200 N. Y. 400, 94 N. E. 199.)

We hold, therefore, that no title to the river could be obtained by prescription. The defendants' use of the waters of the stream, however long continued, and whether adverse or by permission, could not impair the rights of the state.

One of the principal contentions of the defendants is that the state has no proprietary interest in the bed of the streams or the natural products of the waters which it can sell and dispose of. In other words, that if it has the title at all as against these defendants, it holds the title in trust for the benefit of the whole people; and they ask the question: "Can the state sell the bed of a

meandered stream, such sale not being for any other purpose than the enrichment of its general treasury?" Now the state has not undertaken to sell any portion of the bed of the streams, and we have not even before us the question as to the power of the state to grant an exclusive right to an individual or corporation to take these sands from the streams. The statute itself, section 2, expressly provides that no contract shall be entered into granting any exclusive privilege under the act. The defendants rely very much upon the decision of the supreme court of Wisconsin in *Rossmiller v. State,* 114 Wis. 169, 89 N. W. 839, 58 L. R. A. 93, 91 Am. St. Rep. 910. The state of Wisconsin enacted a statute making it unlawful to cut ice from any meandered lake in the state for shipment out of the state unless upon a license obtained from the secretary of state and the payment of a royalty to the state of ten cents per ton. The supreme court held the law unconstitutional on the ground that the right to take ice and to the use of any waters of the public streams and lakes was for the individual enjoyment of all, without restraint other than by reasonable police regulations designed to preserve their use to the whole people, and that the state, while holding the title in trust, has no such proprietary interest in the bed of the streams or the waters over them as it would have a right to sell or dispose of. The state is regarded as a mere trustee for the whole people. We have examined the case with interest, but can not regard it as persuasive upon the question.

It is a well-known fact, of which the court requires no proof, that for commercial purposes the sand of the Kansas river, known everywhere as Kaw river sand, has long been considered by builders and architects to be unsurpassed on account of its sharpness and by reason of other natural properties. It is probably true that no other building sand in the country is shipped to places so distant as the sand from the Kansas river.

Only a limited portion of the people of the state can gain access to the stream and exercise the natural right of taking this valuable natural product from the stream itself.    In Kansas all the legislative power that the people possess is vested in the legislature; and the legislature in its wisdom may have believed that the benefit of the whole people and their rights to enjoy this natural product could best be conserved by imposing a royalty upon the taking of sand from the river for commercial purposes, rather than to permit sand companies like the defendants to have unlimited rights therein. The court is well aware of the fact that the state of Oklahoma is leasing for royalties the oil beds beneath the Arkansas river (*United States v. Mackey,* supra); and that in many of the states the right to prospect and obtain the oil and other mineral products beneath the bed of the public rivers is a valuable one.    It is stated in the brief of the attorney-general that the states of Wisconsin, Minnesota and Michigan receive enormous revenues from the sale of iron and copper ore taken from the beds of the navigable lakes of those states. We have not examined the statutes or decisions for the purpose of inquiring into the matter, but can see no reason why such rights might not be exercised by the states.    The state is the absolute owner of the beds of the streams.    It holds the title in trust for all the people and subject to the right of the federal government with respect to navigation.    It is not our province to consider the wisdom or expediency of the law passed by the legislature, but we think it is within the power of the state to conserve the use of the products of these streams for the benefit of all the people by exacting a royalty for the benefit of the state.    The state owns the sand and recognizes the right of every person to take freely what he needs for his own use, but requires those who engage in the business for profit to pay a royalty for the benefit of all the people.    In *Sanborn v. People's Ice Co.,* 82 Minn. 43, 44, 84 N. W. 641, it was held

that while the taking of ice from public waters was one of common right, it was a right only for personal use, and did not extend to an ice company which was cutting and removing ice for shipment and sale in distant markets for commercial purposes.

In the case of *State v. Pacific Guano Co.*, 22 S. Car. 50, the supreme court of South Carolina upheld the power of the state, holding the title to the beds of tidal waters in trust for all the people, to dispose of phosphate beds as the legislature might deem best for her citizens; and a statute by which the state granted rights to different companies to mine in these beds, imposing penalties on those who undertake to do so without such license, was held valid. A similar case was that of *Coosaw Mining Co. v. South Carolina*, 144 U. S. 550. The case involved the validity of an act of the legislature granting exclusive rights in a corporation to mine in the beds of the Coosaw river, and to remove phosphate rock and deposits. The power of the state to exact royalties for the exercise of such privileges was not disputed.

The defendants, not having shown any title or right to the bed of the streams, are not in a position to object to the manner in which the state seeks to use and dispose of its rights therein. In *United States v. Chandler-Dunbar Co.*, 229 U. S. 53, it was held that inasmuch as the defendant had no property right in the river which has been "taken," it was not interested in the question of the power of the government to sell the surplus water.

It is suggested in the briefs of the attorney-general that we might sustain the law as an exercise by the legislature of its power of regulation, but we do not care to rest the decision upon grounds which would require the court to disregard facts of which it takes notice (*The State v. Kelly*, 71 Kan. 811, 81 Pac. 450) concerning the circumstances and conditions existing at the time the act was passed. All persons well informed with the history of the discussion at the time

know that the principal object sought to be accomplished was to add to the revenue of the state; and there is nothing in the act itself indicating that the question of regulation is not merely incidental to the main purpose of revenue.

The defendants claim that the state law is ineffective as against a permit which they hold from the United States authorizing them to dredge sand from the Kansas river. The permit amounts to nothing more than consent that so far as the right of the government to control the stream for the purposes of navigation is concerned the defendants may continue dredging. In this respect it is not unlike the permits or licenses issued by the internal revenue department authorizing persons to engage in the sale of intoxicating liquors in Kansas. It has never been supposed that such a permit furnishes immunity to the holder from prosecution for a violation of our prohibitory laws.

The legislative history of chapter 259 shows that it was legally adopted by the legislature. The original bill was known as house bill No. 219. It was read three times in each branch of the legislature and on separate days. The main objection to the manner of its passage is, that in the senate the judiciary committee simply reported a substitute for house bill No. 219. It appears, however, that the substitute was germane to the title and that exactly the same result could have been accomplished by returning the original bill and recommending its passage with the amendments. The precise question was before the supreme court of Tennessee in a recent case. (*Railroad v. Memphis,* 126 Tenn. 267, 148 S. W. 662, 41 L. R. A., n. s., 828.) The language of the court in disposing of the contention is so pertinent that we adopt and approve it. In the opinion it was said:

"It is said the committee on municipal affairs simply reported a substitute for House Bill No. 175. The distinction sought to be made between reporting a sub-

14 —92 KAN.

stitute bill and an amendment by substitution is more fanciful than real. As stated, the title of the bill remained the same, and the substitute offered for the original is germane to the title, and is otherwise unobjectionable. The bill cannot be destroyed upon a mere matter of terminology. If it were competent, as is conceded, for the original bill to have been amended by substitution, so as to ingraft upon it the same matter that was contained in the substitute bill, we can see no substantial reason why it is not just as permissible to offer the same subject-matter under the original title as a substitute for the original bill." (p. 293.)

Whatever rule may obtain in other states, in Kansas "an enrolled statute imports absolute verity and is conclusive evidence of the passage of the act and of its validity, unless the journals of the legislature show affirmatively, clearly, conclusively and beyond all doubt that the act was not passed regularly and legally, and this rule applies to the title as well as to the body of the act." (*The State v. Andrews,* 64 Kan. 474, syl. 1, 67 Pac. 870.)

The title to the act is as follows:

"An Act relating to the sale and taking of sand, oil, gas, gravel, mineral and any natural product whatsoever from the bed of any river which is the property of the state or any island therein, and relating to the taking and sale of hay, timber and other products of lands lying in the bends of such rivers; prescribing certain powers and duties of public officers in relation thereto; and prescribing penalties, and repealing inconsistent legislation."

Under the authority of *The State v. Barrett,* 27 Kan. 213, *The State v. Brooks,* 74 Kan. 175, 85 Pac. 1013, *Bank v. Pearce,* 76 Kan. 408, 92 Pac. 53, and decisions cited in the opinions in those cases, it must be held that the title contains but one subject and is broad enough to cover every provision contained in the act. It would be sufficient if the title had read, "An act relating to the sale and taking of sand from public streams within the state." Whether the legislature may provide, as

section 8 of the act purports to do, that certain evidence shall be *prima facie* proof of a fact material to be established in order to warrant a conviction in a criminal case need not be determined. No such question is involved here. Were it conceded that the legislature has no such power it could avail the defendants nothing. It is expressly provided in section 9 of the act that if any provision be held unconstitutional the judgment shall not affect the other provisions, and without this provision it would be our duty so to declare. The certificates of the officers of the house and senate with the presumptions which will be indulged in favor of the regularity of the act are sufficient to show that it was presented to the governor within proper time and duly signed. (*Aikman v. Edwards,* 55 Kan. 751, 42 Pac. 366.)

The contention that the act attempts to confer judicial power upon executive officers is answered by numerous decisions which need not be reviewed. The executive council is an administrative body, and it is well settled that the legislature . may create agencies to carry laws into effect, and that where judgment or discretion is exercised as a mere incident to a ministerial power there is no commingling of judicial and executive powers. (*The State v. Railway Co.,* 76 Kan. 467, 92 Pac. 606, and cases cited in the opinion.)

We have considered all of defendants' numerous objections to the act of 1913, and find no ground upon which we would be justified in declaring it repugnant to the constitution of the state; and since the defendants never acquired, either by grant or prescription, any right or title to the bed of the Kansas river, nor any right to the sand in the bed and channel of the stream, the act does not deprive them of any property rights and can not be considered as in conflict with any of the provisions of the constitution of the United States.

The defendant F. J. Schwartz is in no way interested in this litigation since it appears that he has voluntarily

paid the royalties without protest.   His motion is sustained and the action will be dismissed as to him and judgment given in his favor for costs.   As to all the other defendants, judgment will be entered for the plaintiff, and the peremptory writ will be allowed.