No. 28,001.

THE CONSUMERS SAND COMPANY, *Appellee* and *Cross Appellant*, v. THE EXECUTIVE COUNCIL OF THE STATE OF KANSAS et al., *Appellants* and *Cross Appellees*.

(268 Pac. 123.)

Opinion filed June 9, 1928.

*William A. Smith,* attorney-general, *John G. Egan,* assistant attorney-general, *R. R. Vermilion, Earle W. Evans, Joseph G. Carey, W. F. Lilleston,* all of Wichita, and *Frank H. Mason,* of New York, N. Y., for the appellants.

*Thomas F. Doran, Clayton E. Kline, M. F. Cosgrove* and *Randall C. Harvey,* all of Topeka, for the appellee.

The opinion of the court was delivered by

JOHNSTON, C. J.: This action was brought by the Consumers Sand Company to enjoin the enforcement of orders made by the executive council of the state, and also one made by the irrigation commissioner restricting the taking of sand by the plaintiff from the bed of the Arkansas river between Douglas avenue and Thirteenth street in the city of Wichita. Much testimony was taken upon which the court made elaborate findings of fact, and upon these the court found as conclusions of law in substance that the Arkansas river was a navigable stream, that the sand in the bed of the river is the property of the state, and in the absence of statutory restrictions all citizens have a right to take and use the same, but that no citizen has such a right to the exclusion of others. A conclusion was that the statute (R. S. 1923, ch. 71) relating to the taking of sand from the bed of navigable rivers vested the executive council with authority to sell the sand in accordance with the stated provisions, but did not affect the right of any citizen to take sand for his own use without payment, nor prevent the taking of sand by others for commercial purposes if payment is made therefor in the manner prescribed by statute. It was further concluded that the statute confers discretionary authority upon the executive council to prescribe the conditions for the removal of sand—that discretion, however, being only incidental to the main purpose of the statute— and that the statute was not invalid because it did not provide fur-

ther standards, rules or tests for the guidance of the executive council. A conclusion of the court was that the right given for the removal of sand is in the nature of a special privilege which the executive council could legally grant. That it acts as an administration board, and that in the exercise of its discretion is required to prescribe as uniform conditions as practicable, and should not discriminate between the various citizens of the state in making such conditions. It was further found that the orders of the executive council of February 23, 1922, and September 20, 1926, as well as the one made by the irrigation commissioner on August 7, 1926, are void for the reason that they are discriminatory in favor of citizens of Wichita and against all other citizens of the state of Kansas, and in favor of the sand producers selling their product within the city of Wichita, as against similar producers selling their produce by shipment to points outside of the city. There was a finding that plaintiff was a producer of sand, selling its product by shipment outside of Wichita, and was entitled to maintain an action to prevent discrimination against it and for the protection of its property. Judgment was accordingly entered. The defendants appeal, and plaintiff has also filed a cross appeal, questioning the conclusions as to the extent of the authority vested in the executive council. In connection with its findings and judgment the trial court rendered a written opinion which fairly sets out a condensed statement of the facts, the issues in the case and an excellent discussion of the points of law arising on the facts as follows:

"This action is brought to enjoin the executive council from enforcing certain orders which it made with reference to the removal of sand from the bed of the Arkansas river at Wichita, the validity of such orders being directly involved. The council claims such orders were issued pursuant to the provisions of chapter 71, Revised Statutes 1923, which, in substance, provide that it shall be unlawful for any person to take from beneath the bed of any navigable river of the state of Kansas sand or other materials, except as therein provided. By section 2 of said act it is provided that any person desiring to take sand from such river bed shall first obtain the consent of the executive council 'and upon such terms of payment to the state of Kansas and under such terms and conditions as said executive council may determine to be just and proper.' The statute further provides that the council shall fix the compensation to be paid to the state for such sand, and excludes from its operation, so far as payment therefor is concerned, the removal of sand used exclusively for the improvement of public highways and buildings or for private domestic use. Section 3 authorizes the executive council to make and publish 'all needful rules, terms and conditions for the. taking, purchasing or selling of the articles or products mentioned in this act, and to change the

same as the rights of the state and the interests of the public may require.' Pursuant to this statute the executive council made, but never published in the official state paper, an order dated February 23, 1922, directing that the removal of sand within the city of Wichita cease when the river bed had been lowered to certain specified elevations. On January 2, 1926, the executive council made, and on January 5, 1926, published a general resolution relating to the taking of sand and other products from river beds, containing appropriate provisions for the payment of royalties to the state for the sand taken, the keeping of records by parties taking the sand, giving of bonds to secure the payment therefor, the handling of such moneys by certain state officers, and the auditing of such accounts, etc. On April 9, 1926, the plaintiff company was given permission to take sand from the Arkansas and Kansas rivers upon the terms and conditions of a certain instrument executed on that day by the executive council and styled 'contract,' a true copy of which is attached to the plaintiff's petition and marked Exhibit A. Thereafter and on August 7, 1926, George S. Knapp, the state irrigation commissioner, made an order reciting that the bed of the Arkansas river at Wichita had been lowered below the levels mentioned in the executive council's order of February 23, 1922, and ordered that the further removal of sand therefrom at such locations should cease until such time as the river bed elevation recovered to the elevation set forth in its order of February 23, 1922; a copy of such order being also contained in the plaintiff's petition.

"Thereafter the plaintiff filed an application before the executive council to remove sand notwithstanding such previous order, and a hearing on such application was had on September 20, 1926, the result of which was that the council made an order providing—

" 'That we, the executive council, do hereby order sand pumping from the bed of the river, above Douglas avenue, in the city of Wichita, for car loading for shipment from the city to cease on and after fifteen days from this date; said order to be effective until such time as the river-bed elevation recover to that set forth in paragraph two of the order of the executive council made on February 23, 1922.'

"In the order of February 23, 1922, certain elevations were established below which sand should not be taken at certain places within the city. By paragraph 2 of the order a different and higher set of elevations were established, below which sand should not be taken 'for shipment from the city.'

"The plaintiff now challenges the validity of such orders, contending that the order of February 23, 1922, if valid when made, has been revoked or rescinded by the general order or resolution passed and published January 5, 1925; that the order of September 20, 1926, is void, as it limits the operations of the plaintiff under its contract of April 9, 1926, which contract was entered into under the general resolution passed January 5, 1926, and which did not contain any such limitation of restrictions; that the executive council in making the orders of September 20, 1926, and February 23, 1922, attempted to exercise the police power of the state for the protection of the water supply of the city of Wichita and flood control therein, which powers had not been conferred upon that body; that the order of February 23, 1922, authorizing the engineer of the executive council to issue an order prohibiting the further

removal of sand from the river is void as being an unwarranted delegation of power to such officer; that the order of February 23, 1922, is void because it was never published; that if the removal of sand by the plaintiff imperils the water supply of the city of Wichita, the remedy of the state as well as of the water company, is by a suit in equity in the courts; and that the orders of the council, if otherwise valid, are void for the reason that they are unwarranted in fact, unreasonable, discriminatory and unjust. The defendants deny all of these allegations, and claim that the council acted within their statutory authority in making the orders herein involved, and that such authority has been legally delegated to it.

"The contention of the plaintiff that the order of the irrigation commissioner of August 7, 1927, prohibiting the further removal of sand, and the provision of the order of the council of February 23, 1922, authorizing the engineer of the council to make such orders were void, is not material to the final determination of this case. Unquestionably the plaintiff's contention is correct, and the engineer for the council was without authority to make such an order, and such authority could not be delegated to him by the council, as that would amount to a redelegation of authority by the council. Whatever authority the executive council may have in the premises could not by it be delegated to its engineer, but in view of the fact that the council on September 20, 1926, reaffirmed its order of February 23, 1922, the action taken by the irrigation commissioner or his authority became moot questions and are immaterial. It remains to determine the validity of the orders of the executive council and its powers under the statute.

"The proper approach to the law of the case requires a determination of the nature of the plaintiff's rights alleged to have been violated by the action of the defendants. The title and ownership of the sand and other like materials in the bed of navigable rivers in Kansas lies in the state. The state holds such title in trust for the citizens of the state. By a fiction of law the Arkansas river has been adjudged to be a navigable river. The state therefore holds title to the sand in trust for the people of Kansas. Under chapter 71 it is unlawful to take such sand for commercial use except upon the consent of the executive council. The legislature has seen fit to confer upon the council the authority of permitting persons to take the sand upon such conditions as it may determine to be just and proper. The state was not required to permit the taking of sand and could have undoubtedly held the title thereto indefinitely, but desiring to realize revenue upon the sand which was being taken, the legislature enacted this statute.

"The so-called contract entered into between the plaintiff and the executive council under date of April 9, 1926, relates almost entirely to such matters as methods of keeping records, the making of reports, the inspection of books, the payment for sand taken and violation of the antitrust law. It also contains the provision that the plaintiff agrees to comply in all respects with the regulations of the council determining the terms and conditions under which sand shall be removed, and that it shall not take sand within two hundred and fifty feet of a bridge; and that upon the violation of any of its provisions the contract may be revoked. Under this contract the plaintiff does not agree

to take or pay for any definite amount of sand and neither does the council agree to sell any definite amount. The instrument is not susceptible to enforcement as a contract. It could not be enforced as it is unilateral and lacks that mutuality and definiteness necessary to its enforcement. Neither is the so-called contract a license revocable at will, but in my opinion is that form of an incorporeal hereditament known as a *profit a prendre*. It is a grant of the right to take sand, or, rather, is the giving of permission to take sand. The ownership of the sand does not pass until it has been reduced to the possession of the plaintiff, whereupon it becomes the duty of the plaintiff to account for such sand as it may have taken. The plaintiff acquired no title to the sand in the bed of the river but only has the right to remove it from the bed, and when removed the sand becomes the property of the plaintiff. Plaintiff's right consists merely of the privilege of removing the sand. The state is the absolute owner of the bed of the stream, holding such title in trust for its citizens, and may properly permit the sand to be removed and collect a royalty therefor. The legislature may properly prohibit the removal of sand except upon the consent of the state. The granting of this consent to the exercise of the privilege of removing the sand may properly be delegated by the legislature to an administrative board such as the executive council. But here the difficulty begins. Is it necessary to the proper delegation of such power that the legislature itself prescribe the terms and conditions under which such consent may be granted or refused by the executive council?· Or, having been once granted in general terms, is it necessary for the legislature itself to prescribe the conditions and facts necessary to be found to exist by the executive council before such consent to the removal of sand may be withdrawn or restricted? In other words, is it necessary to the lawful delegation of the authority claimed by the defendant that the legislature prescribe the conditions under which the council may give or withhold consent to the removal of sand or under which the council may restrict or limit such privilege once given? The statute confers authority upon the executive council to consent to the taking of said sand 'under such terms and conditions as the executive council may determine to be just and proper.' By section 3 it is provided that the council may change these conditions for the taking of sand 'as the rights of the state and the interests of the public may require.' Are such statutory provisions sufficient to legally confer upon the council the authority attempted to be exercised by the defendant in this case? The plaintiff contends that the council is merely the sales agent of the state and has only such authority incident to the making of needful rules for keeping an accurate check of the amount of sand taken and to insure payment therefor; that the council had no authority to prescribe conditions for the taking of sand based upon a consideration of the welfare of others or the rights of individuals; that to construe the statute to grant such authority would be tantamount to holding that police power has been conferred upon the council, which must be done by express and appropriate provisions. On the other hand, the defendants do not claim that police power has been conferred upon the council, but rather that the council is vested with discretion in the matter as to where the sand may be taken and under what conditions. It

is admitted by both parties that the right to exercise the police power of the state must be conferred by the legislature in express terms or be necessarily and fairly implied in and incident to the powers expressly granted, and must be essential to the declared purpose of the board—not simply convenient but indispensable. (*Anderson v. City of Wellington*, 40 Kan. 173; *Smith v. Hosford*, 106 Kan. 363; and *Julian v. The Golden Rule Oil Co.*, 112 Kan. 671.)

"It is not of much importance by what name the authority or power conferred upon the council by the legislature is designated, whether it be a delegation of police power or merely the vesting of discretionary authority. It is the nature and character of the power or discretion and the subject matter of its application that is of essential and foremost consideration. Generally speaking, a statute which vests discretion in an administrative body or public officer, conferring arbitrary power to regulate the conduct of a lawful business or the lawful use of private property, without prescribing a rule of action for the guidance of such board or officer, is unconstitutional and void. True, a statute which authorizes a public official to issue or withhold licenses, permits or approval as applied to a lawful business or the lawful use of private property, or the lawful exercise of private rights according to such official's arbitrary action, without specifying the conditions, rules or necessary findings upon which such official shall base his action, is void.

"In my judgment the legislature by the clause contained in the statute 'under such terms and conditions as the executive council may determine to be just and proper,' has not furnished the executive council with any definite rule, standard or measure, or specific condition upon which to predicate its discretionary action. Under the statute the council itself determines what are just and proper conditions for the removal of sand, without the aid of legislative enactment. Such broad and unlimited discretion respecting the conduct of the ordinary lawful business or the exercise of the lawful use of property or personal rights, would make a statute invalid; but its application to the subject matter involved herein is somewhat different than involved in most of the cases supporting the general rule. As above stated, the instrument under which the plaintiff claims its right to remove sand and which is designated as a 'contract,' does not pass title to the sand while in the river bed. Plaintiff's right consists merely of the privilege of removing sand from the state's property. An absolute right to take sand has not been conveyed, but consent only has been given to its removal. Where the discretion of the officer relates to a business, the carrying on of which is a matter of privilege, or to a certain use of property, which use cannot be insisted upon as a matter of right, a different rule appears to be recognized by the courts. This distinction is shown by the cited cases found in a note to *State, ex rel. Makris, v. Superior Court*, 12 A. L. R. 1428-1435.

"Of course, the plaintiff's business is perfectly lawful, but the privilege of removing sand from the state's property is a privilege or right in the nature of a special privilege not common to all. The law permits a person to do with his own property as he sees fit, so long as he does not transgress upon the rights of others or commit a public nuisance; that right is common to all, and the law requires that the discretion vested in an administrative body to

regulate or restrict the use of such property right be expressly conferred and specifically detailed. Under that class of cases where the discretion with respect to matters of mere privilege is involved, we find these relating to the licensing of the sale of intoxicating liquors, the granting or withholding of arbitrary consent to the operation of pool halls, etc. (*State v. Sherow,* 87 Kan. 235.) Such cases refer more particularly to the character of the business engaged in by the party rather than the character and nature of the use or the right to a certain use of property. In this case, while the business of the plaintiff is lawful, yet the removing of sand from the state's property under a permissive consent of the council is not an ordinary property right common to all.

"In the case of *Port Royal Mining Company v. Hagood,* 30 S. C. 519, a statute was considered which delegated to the board of agriculture the power to grant or refuse licenses to mine phosphate rock in the navigable streams of that state 'as the board may in its discretion deem best for the interests of the state,' and held valid against the objection that no standard or rule had been provided in the statute upon which the board was to base its discretion, leaving the granting of the license to the arbitrary and unregulated discretion of the board, upon the ground that the right to remove phosphate rock was not a common right but was in the nature of a special privilege. By section 3, chapter 71 the council is given authority to change the terms and conditions for the taking of sand 'as the rights of the state and the interests of the public may require.' By these provisions, although they are general and indefinite, the legislature has in a manner designated a rule or standard for the council to follow and prescribed a guide for its action. I would think that if it is necessary that the legislature prescribe conditions under which the council may act, that this provision would be sufficient, especially in view of the nature of the right involved.

"There are many causes holding that it is not always necessary that the statute prescribe a definite standard or specify a rule of action to be followed by an administrative board or by which it is to be governed, where it is difficult or impracticable to make a definite or comprehensive rule, or where the discretion relates to the regulation of matters of general welfare. It cannot be reasonably said that the removal of sand from a river bed ordinarily affects the general welfare, but it might be removed under such circumstances and conditions that would affect the general welfare of the community, as, for instance, in such close proximity to a public bridge as to impair its stability or so as to expose and thus tend to weaken public drainage or sewer mains and the like. Under such circumstances a statute authorizing a change of regulations or conditions under which sand may be removed 'as the interests of the public may require' would not necessarily be invalid because it omits to further prescribe the bounds of the authority that is arbitrarily vested in an administrative officer to whom the regulatory discretion has been committed.

"It is true that the order of September 20 does not expressly recite that the council found that the 'rights of the state and interests of the public' required anything; it expressly ordered further taking of the sand to cease 'until such time as the river bed elevation recovered to that set forth in para-

graph 2 of the order of the executive council made on February 23, 1922.' The order of February 23, 1922, provides that—

" 'For the purpose of controlling the removal of sand from the bed of the Arkansas river through the city of Wichita in a manner calculated to effect the most satisfactory adjustment of the problems of city water supply, flood control and sand production, as affected by the removal of sand from the bed of the river, the following orders are made.'

"The plaintiff contends that assuming that the board had the power to make the order involved, it is necessary to the validity of such order that it contains appropriate recitals of a finding of those matters upon which the council's authority to act is based, citing *Wichita Railway & Light Co. v. P. U. C.,* 260 U. S. 48. Whether an express finding is necessary to the validity of the order or whether the order made may be construed to contain such finding, is rendered immaterial to the decision in this case by reason of matters hereinafter discussed.

"Chapter 71 was passed primarily as a revenue measure and was intended to be a grant by the legislature of its power of regulation only in so far as such power was incidentally involved. In discussing this feature of the statute the court said in *State, ex rel., v. Akers,* 92 Kan. 169, 209:

" 'All persons well informed with the history of the discussion at the time, know that the principal object sought to be accomplished was to add to the revenue of the state; and there is nothing in the act itself indicating that the question of regulation is not merely incidental to the main purpose of revenue.'

"It does not necessarily follow because the main purpose of the statute was to procure revenue that the legislature might not properly vest discretionary power to be incidentally exercised by the executive council in prescribing conditions for the removal of sand when the interests of the public require. If, in the exercise of the discretion vested in it, the council sought to protect private investments or private rights, that would be an unwarranted exercise of their discretion, and if, in the issuance of its orders prohibiting the further removal of sand below certain levels, the executive council contemplated the prevention of interference with the operation of the Wichita Water Company's wells, without regard to the public interests generally, its action would unquestionably be invalid. The council has no power whatever to protect private investments, and the redress of the water company would lie in the courts. The council can only take cognizance of the 'rights of the state and interests of the public' in the exercise of the broad discretion conferred upon it and in its determination of what conditions are 'just and proper.'

"While the executive council may have considerable discretion in prescribing conditions for the removal of sand within the city of Wichita, yet those conditions must be uniform as to all persons removing sand from the river bed. The statute permits the taking of sand 'without payment therefor,' to be used in public improvements or for the taker's own domestic use. It is upon the sand taken for commercial use and disposition that the statute attempts to collect a royalty. The conditions under which the sand may be taken, such as the place, depth, proximity to a bridge, etc., should be as uniform as practicable and not discriminatory against the citizens of the state.

Under the order of September 20, 1926, sand may be taken to any depth, if not taken for the purpose of 'car loading and for shipment from the city.' Under the order of February 23, 1922, two different elevations are established, the lower ones being applicable generally, while the higher ones apply to carload shipments from the city. It is not apparent, nor has any good reason been assigned, why this discrimination should exist. Certainly, the 'city water supply or flood control,' for the control of which the order of February 23, 1922, purports to have been made, would not be any differently affected, whatever the nature of disposition was made of the sand after removal. If the removal of the sand has any bearing or effect whatever upon either the water supply or flood control, such effect would not be increased by shipments from the city or lessened by local disposition. Such discrimination cannot be justified in theory, reason or fact. It creates an arbitrary preference in favor of the consumers of Wichita and against other citizens of the state receiving carload shipments from the city of Wichita. Whatever discretion the council has in reference to prescribing conditions for the removal of sand must be fairly and impartially exercised. A restrictive regulation based upon the locality where the sand is to be used is just as discriminatory, arbitrary, unjust and unwarranted as one based upon the color or sex of the party using it. In my opinion this feature of the order is an unwarranted abuse of discretionary power, and of itself entitles the plaintiff to the relief sought.

"The consideration of the case might well end here but for the request for findings of fact relative to the effect of the removal of sand below the elevations prescribed in the order upon the water supply available to the citizens of Wichita.

"A comprehensive discussion of the facts respecting the source and extent of the water supply and the causes of the varying fluctuations in the water table would serve no useful purpose to the determination of this case, but a few general observations might be pertinent to a proper understanding of the situation involved. The Arkansas river enters the city of Wichita from the northwest and consists of two branches, known as the Big Arkansas and the Little Arkansas rivers. The confluence of these two rivers is a short distance above Douglas avenue. The city of Wichita is built over a strata of sand and gravel, through which there is a constant flow of water. This underflow at the city of Wichita is several miles in width, and the sand and gravel through which it flows is from thirty-five to forty-five feet in depth. The evidence discloses that the source of this underflow originates either in eastern Colorado or at least in the western portion of this state, and the catchment basin extends many miles in width, varying in depth as the formation of the water-bearing strata itself varies. The rate of movement of the underflow is comparatively slow, being from five to eight feet per twenty-four hours.

"The bed of the Arkansas river is composed of sand and gravel of extraordinary coarseness, which gives it a great commercial value. For the last fifteen years a large amount of sand has been removed from the river bed at Wichita by various companies and individuals. This removal originally was south of the Douglas avenue bridge, but has continued up stream until most of the larger plants which are now operating are located a mile or a mile and a half

above Douglas avenue. The A. T. & S. F. Railway Company has removed a large amount of sand which was used in certain of its improvements in the city, and other large quantities of sand were removed for the purpose of filling in several acres of ground adjacent to the river. The sand pumps of the plaintiff are operated from boats, and the sand is conveyed from the boats in the river to bins and hoppers on the south bank of the river, from which it is loaded into cars. As the sand is removed the boats are moved from bank to bank across the river. The company removes sand from approximately the entire width of the river bed. Such operations have been gradually extended up the river to beyond a point opposite Water Works island, upon which the Wichita Water Company, a private corporation, operates its plant, and from which it furnishes water to the citizens of Wichita.

"During the last ten or twelve years the grade line of the river bed has been lowered from four to seven feet. The operation of the sand pumps, while no doubt contributing largely to the lowering of the river bed, cannot be said to be the only cause of such lowered level. The river has been narrowed by the artificial filling in of the banks. The width of the river has been narrowed from eight hundred to five hundred feet, and this has caused a certain amount of scouring out of the river bed. But whatever the cause, whether artificial or natural, the level of the bed of the river has been lowered considerably within the last few years. As long as the water is flowing in the river, it would make no difference in the water supply of the city whether the bed of the river had been lowered or not by the removal of sand, and the possible effect of the removal of sand upon the water supply only arises when the table of the underflow is the same as or below the bed of the river. It is claimed by the defendant that the further lowering of the river bed would lower the water elevation of the underflow and thus affect the system of wells at the water company's plant, which effect the plaintiff denies.

"The Wichita Water Company has a system of forty-three siphon wells, comprised of two groups, one consisting of twenty-six wells located along the Big Arkansas river, and the other consisting of seventeen wells adjacent to the Little Arkansas river. These wells extend from forty to forty-five feet through the water-bearing sand and gravel to the top of the hardpan. Each well is connected by a system of piping to a central receiving well, and operates by syphonic action. In addition to the syphon wells, the company has installed four motor-driven wells, which have a greater water-producing capacity than the syphon wells. Such a syphonic system of collecting water is limited by the elevation of the water in the receiving well and also by the elevation of the ground-water level. Upon the former of these two factors the removal of sand by the plaintiff could have no bearing and plaintiff's operations could only affect the water supply by lowering the ground-water level. The lowering of the level of the water table reduces the head and decreases the flow of water into the wells.

"The principal issue of fact is whether the removal of the sand from the river bed has any substantial effect upon the elevation of the water table or ground-water level. Upon this point the opinions of the engineers who testified for the parties varied considerably. From the testimony of these gentlemen I am of

the opinion that the removal of sand does not lower the water table of the underflow over the entire width of the water-bearing strata or catchment basin. At most, the lowering of the river bed might have the effect of acting to some extent as a drain for the underground water in the land immediately adjacent to the deepened channel, but does not affect the ground-water level generally throughout the plane of the underflow. From the evidence it appears that there has been a lowering of the elevation of the level of the underflow generally throughout the Arkansas Valley, due, no doubt, to the increased consumption of the various cities located along its course and the demands made upon it by increased irrigation and more extensive vegetation. It would seem that the immense volume of water daily taken by the water company would tend much more to reduce the water plane than the removal of sand in the river bed.

"It is apparent from the testimony that the volume of the water supply is not affected to any appreciable extent, if at all, by the removal of sand and that there is an abundance of available water to supply a city of many times the population of Wichita. The lowering of the river bed may affect the availability or accessibility of water in the underflow under the present system of syphon wells operated by the water company, but has no substantial effect upon the amount of available water for the city's use. In other words, the supply of water is to no substantial degree affected by the removal of sand, but it is only the supply of water available to the water company under its present syphonic system that could be said to be to any degree affected. Mr. Biggs, the chief engineer of the Wichita Water Company, frankly admitted in his testimony that by spreading the pumping stations over a more extended area along the course of the underflow, there would be an abundant supply of water for the city. In his report to the executive council, Mr. Knapp, the irrigation commissioner, engineer for the defendant, stated that the local effect of the lowering of the river bed does not greatly decrease the quantity of ground water passing under the city water works plant. By the installation of more motor-driven wells, the water company could overcome any interference which is now experienced because of a lowered river bed. This situation presents the question of whether the cost of installing such new equipment would be a matter of public interest or private investment, to which there was only an incidental reference made in the testimony. The council's order is predicated upon water supply and flood control and not upon the increased cost to the citizens of Wichita for water produced under a collecting system of greater capacity. Under the question of flood control, I think it must be admitted that whatever effect the removal of sand may have respecting such matter, it is to lessen the possibility of damage by floods. Mr. Knapp, the irrigation commissioner, in his report to the council, stated, 'the pumping of sand from the river at Wichita has increased the flood-carrying capacity of the channel,' and cites the instance of the Pueblo flood as illustrative of the benefit to the city of Wichita of a deepened river channel. Findings of fact have been made which cover the issues raised by the evidence, and a further discussion herein would add nothing to those findings.

"In accordance with the views heretofore expressed, it is my conclusion

that the order of the executive council is invalid as being discriminatory and an arbitrary abuse of discretionary power, and that the plaintiff is entitled to the relief sought."

The quoted opinion of the trial court is deemed to be a fair and full treatment of the facts in the case and an admirable and sound discussion of the questions of law involved. That opinion is approved and adopted by this court.

None of the errors assigned by the appealing parties can be sustained, and, therefore, the judgment is affirmed.

HARVEY and HOPKINS, JJ., not sitting.

DAWSON, J. (dissenting in part): At first blush the charge that the order of the executive council discriminates in favor of the citizens of Wichita and against all the other citizens of the state of Kansas sounds serious, but when it is closely looked into that discrimination is discovered to be so attenuated and fine spun that it ought not to be made the basis of a judicial decision. Not all the other citizens of the state of Kansas nor any infinitesimal fraction of them will care to take sand from the Arkansas river within the corporate limits of Wichita. Why should they? What does it matter to the people of Hutchinson, Great Bend and Garden City, or to the people of Brown, Cheyenne and Cherokee counties that they cannot take sand from the Arkansas river within the corporate limits of Wichita when the water stage shrinks to the level prescribed by the executive council? The people of these far-away towns and counties will never suffer from such rarefied, fanciful discrimination. Like sensible folk they will help themselves to what sand they need from the bed of some public stream of more convenient access, mayhap some part of this same Arkansas river nearer home.

I interpret the order of the executive council as being based on the practical and reasonable idea that all the sand that the citizens of Wichita will care to take away for their own use will have no perceptible effect on the water level of the river, and that it is only when sand is taken in vast quantities for shipment in intrastate or interstate commerce—on the extensive scale in which the Consumers Sand Company plies its trade, for example—that the water level of the river will be materially affected in times of prolonged drought.

At all events the order of the executive council should not be

judicially denounced until a case actually arises where some citizen of Kansas, residing outside of Wichita and in good faith and for his own use desires to take some sand from the Arkansas river within the city limits of Wichita, is hindered in such purpose by the order in controversy.

I dissent from paragraphs 2 and 3 of the syllabus and so much of the opinion as deals therewith.